Seth E. Spitzer
Andrew T. Foglia
Winston & Strawn LLP
200 Park Avenue
New York, NY  10166
Tel.: (212) 294-3290
Fax: (212) 294-4700
sspitzer@winston.com
afoglia@winston.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                             :
DANFOSS POWER SOLUTIONS (US) COM-                            :
PANY,                                                        :    Case No. 1:18-cv-06237
                                                             :
                            Plaintiff,                       :
                                                             :    **COMPLAINT**
               v.                                            :
                                                             :
                                                             :
CHARLES R. MADDUX, JR.; JENNIFER                             :
MADDUX; CAITLYN WHITE; HOLLIS N.                             :
WHITE, JR.; HOLLIS N. WHITE, III; JEFFREY                    :
N. WHITE; LOIS WHITE; and ELIOT CLAUSS,                      :
in his capacity as the Sellers' Representative,              :
                                                             :
                            Defendants.                      :
------------------------------------------------------------ x

For its complaint against Charles R. Maddux, Jr.; Jennifer Maddux; Caitlyn White; Hollis

N. White, Jr.; Hollis N. White, III; Jeffrey N. White; Lois White (collectively, "Sellers"); and El-

iot Clauss, in his capacity as Sellers' Representative, Plaintiff Danfoss Power Solutions (US)

Company ("Danfoss") alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from the misrepresentation of the financial condition of Propul-

sys, Inc. ("Propulsys") in connection with its sale to Danfoss.

2.      Under that certain Stock Purchase Agreement dated July 11, 2016 (the "Stock Purchase Agreement"), by and among Danfoss, Sellers, and Eliot Clauss as Sellers' Representative, Propulsys represented that Propulsys and its subsidiaries were in compliance with all governing laws. In particular, in Section 4.12(q) of the Stock Purchase Agreement, Propulsys represented that each Foreign Employee Plan[1] established by Propulsys or its subsidiaries "has been established, maintained, and administered in compliance with its terms and all applicable Legal Requirements in all material respects . . . ."  And in Section 4.13 of the Stock Purchase Agreement, Propulsys represented that Propulsys and its subsidiaries "ha[ve] at all times been, and ha[ve] operated [their] business, in compliance with each material Legal Requirement[2] that is or was applicable to [them] or the conduct of [their] business[.]"

3.      Propulsys further represented that Propulsys's consolidated financial statements for the years 2014-2015 were accurate in all material respects.[3]

---

[1] The Stock Purchase Agreement defined this term (Foreign Employee Plan) to include "any bonus, incentive compensation, deferred compensation, profit sharing, stock option, stock purchase, equity based, phantom equity, savings, retention, redundancy, termination, severance, change-in-control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, accident, post-employment (including retiree medical or retiree life), vacation, holiday, sick leave, fringe benefit, or welfare benefit plan, and any other employee benefit plan, agreements or arrangement sponsored, maintained, or contributed to or required to be contributed to, or to which any Acquired Company has or could have any Liability thereunder, primarily for the benefit of any current or former employee, director, consultant or member who is a foreign national or otherwise residing outside of the United States." Stock Purchase Agreement Ex. A.

[2] The Stock Purchase Agreement defined "Legal Requirement" to include "any constitution, law, ordinance, code, regulation, statute, or order of general applicability of any Government Body, including rules and regulations promulgated thereunder." Stock Purchase Agreement Ex. A. Therefore, when this Complaint refers to laws, applicable laws, governing law, *et al.*, these terms should be understood to invoke the defined term "Legal Requirement" in the Stock Purchase Agreement.

[3] *See* Stock Purchase Agreement § 4.4.

2

4.      In fact, unbeknownst to Danfoss, for years White (China) Drive Products ("WCDP"), a subsidiary of Propulsys, had underpaid required contributions to its employees' pension, medical insurance, unemployment insurance, and work-related injury insurance; omitted bonuses from overtime calculations; and erroneously calculated leave accruals relative to the requirements of applicable Chinese laws.

5.      For 2016 in particular, which was the year during which the parties entered into the Stock Purchase Agreement, WCDP paid the Chinese authorities and its employees $562,929 less than it was required to pay under applicable law.

6.      Thus, not only was WCPD not in compliance with all material Legal Requirements, but, as part of the Stock Purchase Agreement, Propulsys represented as accurate financial statements that were, in fact, inflated. These inflated financial statements suggested an Earnings Before Interest and Tax ("EBIT") for Propulsys $562,929 higher than it would have been had Propulsys complied with each material Legal Requirement and made the necessary payments as required by law.

7.      Danfoss calculated the purchase price for Propulsys based on multiple methods of valuation and ultimately concluded that a valuation of 13.7 times EBIT was appropriate.

8.      Because the valuation of Propulsys Danfoss ultimately utilized involved multiplying Propulsys's EBIT by 13.7, the misrepresentation of WCDP's compliance with the law and Propulsys's consolidated income, which included WCDP's financials, resulted in Danfoss's artificially elevated valuation of Propulsys and its agreement to overpay Sellers in connection with its purchase of Propulsys by $7,712,127.

9.      Propulsys's conduct was a material breach of the Stock Purchase Agreement and fraudulent, insofar as it entailed a misrepresentation regarding a present fact. Sellers agreed to

3

indemnify Danfoss with respect to any and all losses incurred by Danfoss arising from the inaccuracy of such representations.[4] Danfoss heretofore seeks damages and any other relief the Court may deem proper.

## PARTIES

10.     Danfoss is a United States-based indirect subsidiary of Danfoss A/S, focused on the design and manufacture of hydraulic and electronic systems and components.  Danfoss is organized under the laws of Delaware and headquartered in Ames, Iowa.

11.     Charles R. Maddux, Jr. is a former President, CEO, and shareholder of Propulsys and a resident of Kentucky.

12.     Jennifer Maddux is a former shareholder of Propulsys and a resident of Kentucky.

13.     Caitlyn White is a former shareholder of Propulsys and a resident of Tennessee.

14.     Hollis N. White, Jr. is a former Vice President and shareholder of Propulsys and a resident of Kentucky.

15.     Hollis N. White, III is a former shareholder of Propulsys and a resident of Kentucky.

16.     Jeffrey N. White is a former board member and shareholder of Propulsys and a resident of Kentucky.

17.     Lois White is a former shareholder of Propulsys and a resident of Kentucky.

18.     Eliot Clauss is the Sellers' Representative and a resident of New York.

---

[4] Stock Purchase Agreement § 9.1(b).

4

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because this suit is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over the parties because, as part of the Stock Purchase Agreement, both parties consented to the Court's jurisdiction in any action connected with the Stock Purchase Agreement.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because in the Stock Purchase Agreement the parties expressly consented to this Court's personal jurisdiction and named New York state and federal courts as the exclusive venues for actions connected with the Stock Purchase Agreement.

## FACTUAL BACKGROUND

**Danfoss Agrees to Purchase Propulsys**

22.     In July 2016, Danfoss, Propulsys, and Sellers reached an agreement by which Danfoss would purchase Sellers' shares in Propulsys for approximately $87 million.

23.     As part of that agreement, Propulsys represented, as of July 11, 2016 and September 8, 2016 (the "Closing Date")that the Financial Statements reflected in Schedule 4.4(a) to the Stock Purchase Agreement, covering the years 2014-2015, as well as the first four months and six days of 2016, "fairly present the consolidated financial condition and the results of operations, changes in stockholders' equity, and cash flows of [Propulsys] and its subsidiaries as at the respective dates of, and for the periods referred to in, the Financial Statements."[5]

---

[5] Stock Purchase Agreement § 4.4(a).

24.     Propulsys represented, as of July 11, 2016 and as of the Closing Date, that the Pro Forma Financial Statements reflected in Schedule 4.4(b) to the Stock Purchase Agreement, covering the years 2014-2015, as well as the first four months and six days of 2016, "fairly present the consolidated financial condition and the results of operations, changes in stockholders' equity, and cash flows of [Propulsys] and its subsidiaries as at the respective dates of, and for the periods referred to in, the Pro Forma Financial Statements."[6]

25.     Propulsys represented, as of July 11, 2016 and as of the Closing Date, that, except as set forth in Schedule 4.9 to the Stock Purchase Agreement, neither Propulsys nor any acquired Propulsys subsidiary has or at the Closing will have "any liability, obligations or commitments in any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise (each, a "Liability"), except for (a) those Liabilities set forth in (i) the Acquired Companies' Interim Balance Sheet or (ii) the Closing Purchase Price Statement, but solely to the extent reflected in the calculation of the Purchase Price; and (b) Liabilities in an aggregate amount less than $100,000 that have arisen after the Interim Balance Sheet Date in the Ordinary Course of Business (none of which relates to any breach of contract, breach of warranty, tort, infringement, or violation of Legal Requirement or arose out of any lawsuit)."[7]

26.     Propulsys represented, as of July 11, 2016 and as of the Closing Date, that each Foreign Employee Plan "(i) . . . has been established, maintained and administered in compliance with its terms and all applicable Legal Requirements in all material respects . . . ."[8]

---

[6] Stock Purchase Agreement § 4.4(b).

[7] Stock Purchase Agreement § 4.9.

[8] Stock Purchase Agreeemnt § 4.12(q).

6

27.     Propulsys represented, as of July 11, 2016 and as of the Closing Date, that, "[e]xcept as set forth in Schedule 4.13(a), since January 1, 2013, each Acquired Company has at all times been, and has operated its business, in compliance with each material Legal Requirement that is or was applicable to it or the conduct of its business or the ownership or use of any of its assets."[9]

28.     Pursuant to Section 9.1(b) of the Stock Purchase Agreement, Sellers jointly and severally agreed to indemnify Danfoss with respect to any losses arising from "any breach of any warranty or the inaccuracy of any representations contained in Article 4 of [the Stock Purchase Agreement]."

29.     Danfoss would only be entitled to such indemnification to the extent that its losses exceeded the $250,000 deductible,[10] with the caveat that this limitation would not apply to claims based on "fraud or willful misconduct."[11]

30.     Pursuant to Section 9.5 of the Stock Purchase Agreement, a party seeking indemnification under the Stock Purchase Agreement was to provide notice to the indemnitor "describing in detail the facts giving rise to the claim for indemnification." "[N]o delay on the part of the [party seeking indemnification] shall relieve the Indemnitor from any obligation hereunder except to the extent that the Indemnitor is actually prejudiced thereby."[12]

---

[9] Stock Purchase Agreement § 4.13.

[10] Stock Purchase Agreement § 9.2(b).

[11] Stock Purchase Agreement § 9.2 (d).

[12] Stock Purchase Agreement § 9.5(a).

31.    Pursuant to Section 9.9 of the Stock Purchase Agreement, the parties agreed that indemnification under the terms of the Stock Purchase Agreement would be the exclusive remedy for claims arising out of the Stock Purchase Agreement, except "in respect of claims based on fraud, willful misconduct, or criminal acts committed by or on behalf of (i) [Propulsys] (as of or prior to the Closing) or (ii) the Sellers."

32.    Pursuant to Section 11.9 of the Stock Purchase Agreement, the parties agreed that the Stock Purchase Agreement would be governed by New York law, "without regard to conflicts of laws principles that would require the application of any other law."

33.    Pursuant to Section 11.10 of the Stock Purchase Agreement,  "any Proceeding arising out of or relating to this Agreement . . . shall be brought in the courts of the State of New York or in the United States District Court for the Southern District of New York . . . and each of the parties irrevocably submits to the exclusive jurisdiction of each such court . .. [and] waives any objection it may now or hereafter have to venue or to convenience of forum."

**WCDP Was, At the Time of the Signing and at the Time of the Closing, In Violation of Chinese Law**

34.    On information and belief, at the time Propulsys made the representations contained in Sections 4.4, 4.9, 4.12, and 4.13, Propulsys and the Sellers knew them to be false.

35.    WCDP was, in fact, in violation of Chinese Social Insurance and Labour laws and had unreported obligations to its employees' pension, medical insurance, unemployment insurance, and work-related-injury insurance.

The Social Insurance Law

36.     The Social Insurance Law of the People's Republic of China (the "Social Insurance Law") requires employers to contribute to their employees' pension, medical insurance, unemployment insurance, and work-related-injury insurance.[13]

37.     Under the Social Insurance Law, an employer's contribution is determined by applying a mandatory contribution percentage to the relevant insurance base, which includes hourly wages, bonuses, overtime wages, wages paid under special circumstances, and allowance at subsidies.[14]

38.     Each province of the People's Republic of China sets the mandatory contribution amount as a percentage of an employee's total wages. The percentages that apply to WCDP, which is located in Zheng Jiang City, are available in Mandarin on the official website of the Zhengjiang Municipal Human Resources and Social Security Bureau: http://hrss.zhen-jaing.gov.cn/gzcy/rdxx/201703/t20170328_1828331.htm. The chart below provides the applicable percentages as of the closing date, which add up to 30.9% of the total wages:

| Pension Insurance | Unemployment Insurance | Work-Related Injury Insurance | Medical Insurance | Maternity Insurance |
|---|---|---|---|---|
| 19.00% | 1.00% | 1.40% | 9.00% | 0.5% |

39.     In violation of the Social Insurance Law, WCDP allowed its employees to select a below-requirement base to which these mandatory contribution percentages would apply.

---

[13] *See* Social Insurance Law §§ 12, 23, 44, 53, available at: https://www.cecc.gov/resources/legal-provisions/social-insurance-law-of-the-peoples-republic-of-china.

[14] *See* Circular on Relevant Matters Concerning the Standardization of the Social Insurance Contribution Base § 2, available at: http://hk.lexiscn.com/law/law-english-1-3079869-T.html.

40.     In 2014, WCDP's reported monthly insurance base was RMB 834,594 as compared to RMB 1,546,959 required under the Social Insurance Law.

41.     In 2015, WCDP's reported monthly insurance base was RMB 966,466 as compared to RMB 1,723,772 required under the Social Insurance Law.

42.     In 2016, WCDP's reported monthly insurance base was RMB 1,127,541 as compared to RMB 1,945,026 required under the Social Insurance Law.

43.     Applying the applicable percentages to calculate the mandatory contribution set forth in paragraph 38 above, to the annualized difference between the reported bases and the required bases under the Social Insurance Law, resulted in a shortfall in payment to the government of RMB 2,601,988 ($387,696) for 2014, RMB 2,739,534 ($408,191) in 2015, and RMB 2,956,418 ($440,506) in 2016.[15]

The Labour Law

44.     The Labour Law of the People's Republic of China fixes overtime rates at 150% of "normal wages" for an extension of working hours; 200% of normal wages if work is arranged on off-days and an employee cannot be given a make-up day off; and 300% for work on statutory holidays.[16]

45.     "Normal wages" includes non-discretionary bonuses.

46.     In violation of these provisions, WCDP failed to include non-discretionary bonuses in "normal wages" in calculating overtime payments to its employees.

---

[15] These U.S. dollar figures are based on the exchange rate as of the Closing Date, 1 RMB = 0.149 USD.

[16] Labour Law § 44, available at: http://www.china.org.cn/living_in_china/abc/2009-07/15/content_18140508.htm.

47.     In 2014, WCDP paid RMB 502,914 in overtime to its employees, as opposed to the RMB 749,016 owed under the Labour Law's overtime formula.

48.     In 2015, WCDP paid RMB 954,742 in overtime, as opposed to the RMB 1,480,293 owed under the Labour Law's overtime formula.

49.     In 2016, WCDP paid 1,116,787 in overtime, as opposed to the RMB 1,693,333 owed under the Labour Law's overtime formula.

50.     These differences resulted in an underpayment of RMB 246,102 ($36,669) in 2014, RMB 525,550 ($78,307) in 2015, and RMB 576,545 ($85,905) in 2016.

<u>Accrual of Vacation Days</u>

51.     Under the People's Republic of China's Regulations on Paid Annual Leaves of Employees (the "Annual Leave Regulations"), employees are entitled to annual leave after their first year of employment. The number of days to which they are entitled depends on the number of years of service.[17]

52.     The Implementing Measures for the Paid Annual Leave of Enterprise Employees provide that an employee's years of service with prior employers must be included for purposes of calculating the number of annual leave days to which an employee is entitled.[18]

53.     In violation of these provisions, WCDP based its calculation of Paid Annual Leave on its employees' service years at WCDP only, rather than including years of service for prior employers.

_____

[17] *See* Annual Leave Regulations § 3, available at: http://www.ilo.org/dyn/travail/docs/372/Regulations%20on%20Paid%20Annual%20Leave%20for%20Employees%20-%20www.junhe.com.pdf.

[18] *See* People's Republic of China Implementing Measures §4 (stating that "[t]he working period of an employee in the same or different employing entities . . . shall be calculated as the accumulated working time.").

54.     In 2014, WCDP's annual leave costs were RMB 294,951 when, under the People's Republic of China's Regulations on Paid Annual Leaves of Employees, they should have been RMB 573,676.

55.     In 2015, WCDP annual leave costs were RMB 353,333 when, under the Annual Leave Regulations, they should have been RMB 668,910.

56.     In 2016, WCDP's annual leave costs were RMB 482,815 when, under the Annual Leave Regulations, they should have been RMB 727,897.

57.     These differences resulted in an underpayment of RMB 278,725 ($41,530) in 2014, RMB 315,577 ($47,021) in 2015, and RMB 245,082 ($36,517) in 2016.

Total Loss

58.     Propulsys omitted these shortfalls from financial statements included in Schedules 4.4(a) and 4.4(b) in connection with the Stock Purchase Agreement. As a result, the financial statements included in Schedules 4.4(a) and 4.4(b) overstated Propulsys's income, and the EBIT derived from the financials was inflated by $465,895 (RMB 3,126,815) for 2014 and $533,519 (RMB 3,580,661) for 2015.

59.     In 2016, the year during which the transaction between the parties took place and the last year during which Sellers controlled Propulsys's business practices, the aggregate overstatement of Propulsys's EBIT was $562,929 (RMB 3,778,046).

60.     Danfoss's ultimate valuation of Propulsys, arrived at after considering a variety of factors and methods of calculation, was approximately 13.7 times EBIT, resulting in its agreement to buy Propulsys for the amount stated in the Stock Purchase Agreement of approximately $87 million.

61.     This figure was subsequently adjusted pursuant to Sections 2.2 and 2.3 of the Stock Purchase Agreement, which called for the $87 million to be increased or decreased according to (a) the net cash of Propulsis, (b) the difference between closing and target capital amounts, as defined in the Stock Purchase Agreement, (c) the debt of Propulsys, as of the closing date, and the transaction expenses of Propulsys.

62.     Pursuant to Sections 2.2 and 2.3 of the Stock Purchase Agreement, Danfoss paid Sellers an additional $2,292,781 after the closing.

63.     As a result of Propulsys's misrepresentations, Propulsys overstated Propulsys's value in connection with the sale of Sellers' equity interests in Propulsys to Danfoss by $7,712,127.

64.     The transactions contemplated under the Stock Purchase Agreement closed on September 8, 2016. After the sale of Propulsys was completed, Danfoss discovered Propulsys's illegal policies and procedures and revised those policies and procedures to comply with all material Legal Requirements, effective as of January 1, 2017. Danfoss therefore suffered additional costs to bring WCDP's policies and procedures in line with local law and in seeking indemnification for Sellers' breaches.

**Danfoss Sends Sellers An Indemnification Claim**

65.     On September 5, 2017, Danfoss sent Sellers' Representative an indemnification claim notice outlining Sellers' breach of the Stock Purchase Agreement, based on WCDP's violation of Chinese law.

66.     On October 2, 2017, Sellers' Representative delivered an Indemnity Dispute Notice denying that Sellers had breached the Stock Purchase Agreement and denying that Danfoss had suffered any losses as a result.

67.     On January 17, 2018, Danfoss responded to Sellers' Dispute Notice and provided further information on its claims.

68.     Sellers again rejected the claim, in a letter dated May 9, 2018.

## COUNT ONE
### (Breach of Contract)

69.     Danfoss incorporates every allegation above as if set forth fully here.

70.     The Stock Purchase Agreement was a valid contract binding on both parties.

71.     Danfoss performed its obligations under the Stock Purchase Agreement by purchasing Propulsys for approximately $89,292,781.

72.     Propulsys breached its obligations under the Stock Purchase Agreement by falsely representing the accuracy of Propulsys's consolidated financial statements and WCDP's compliance with applicable laws.

73.     Propulsys breached representations in Sections 4.4(a) and 4.4(b) of the Stock Purchase Agreement pertaining to the accuracy of Propulsys's Financial Statements by overstating Propulsys's consolidated income in connection with WCDP's underpayment of required social insurance contributions, omission of bonuses from overtime calculations, and erroneous calculation of leave accruals.

74.     Propulsys breached representations in Section 4.12(q) of the Stock Purchase Agreement pertaining to the WCDP Foreign Employee Plan disclosed in Schedule 4.12(q) to the Stock Purchase Agreement, in connection with WCDP's underpayment of required social insurance contributions, the omission of bonuses from overtime calculations, and the erroneous calculation of leave accruals.

75.     Propulsys breached their representations in Section 4.13 of the Stock Purchase Agreement pertaining to Propulsys's and WCDP's compliance with each material Legal Requirement that is or was applicable to them or the conduct of their business.

76.     As a result, Propulsys's consolidated financial statements for 2016 overstated Propulsys's income and thereby inflated the EBIT on which the purchase price included in the Stock Purchase Agreement was based. Danfoss paid $7,712,127 more for Propulsys than it would have if Sellers had not breached their representations.

77.     Danfoss also incurred consequential damages to bring WCDP's practices in line with Chinese law. These damages were the foreseeable result of Propulsys's breach of its representations regarding Propulsys's and its subsidiaries' compliance with local law.

78.     Sellers breached their obligation under Section 9.1 of the Stock Purchase Agreement to indemnify Danfoss with respect to any losses arising from "any breach of any warranty or the inaccuracy of any representations contained in Article 4 of this agreement."

79.     Danfoss is entitled to money damages for Sellers' breach of contract.

## COUNT TWO
### (Fraudulent Inducement)

80.     Danfoss incorporates every allegation above as if set forth fully here.

81.     At the time of the Stock Purchase Agreement, Propulsys' misrepresented several present facts.

82.     Propulsys represented that the consolidated financial statements set forth in Schedule 4.4(a) "fairly present the consolidated financial condition and the results of operations, changes in stockholders' equity, and cash flows of [Propulsys] and its Subsidiaries as at the respective dates of, and for the periods referred to in [such financial statements." In fact, the consolidated financial statements set forth in Schedule 4.4(a) overstated Propulsys's income and

thereby inflated Propulsys's EBIT by $465,895 (RMB 3,126,815) for 2014 and $533,519 (RMB 3,580,661) for 2015.

83.     Propulsys represented that the consolidated financial statements set forth in Schedule 4.4(b) "fairly present the consolidated financial condition and the results of operations, changes in stockholders' equity, and cash flows of the [Propulsys] and its Subsidiaries as at the respective dates of, and for the periods referred to in, [such financial statements]." In fact, the consolidated financial statements set forth in Schedule 4.4(b) overstated Propulsys's EBIT by $465,895 (RMB 3,126,815) for 2014 and $533,519 (RMB 3,580,661) for 2015.

84.     Propulsys represented under Section 4.9 of the Stock Purchase Agreement that WCDP had no undisclosed liabilities. In fact, WCDP had undisclosed liabilities under the laws of the People's Republic of China arising from its underpayment of required social insurance contributions, omission of bonuses from overtime calculations, and erroneous calculation of leave accruals.

85.     Propulsys represented that the WCDP Foreign Employee Plan disclosed in Schedule 4.12(q) of the Stock Purchase Agreement, was established, maintained, and administered in compliance with all applicable legal requirements in all material respects. In fact, WCDP's maintenance and administration of its Foreign Employee Plan was in violation of the Social Insurance Law, the Labour Law, and the Annual Leave Regulations.

86.     Propulsys represented that Propulsys and WCDP were in compliance with each material Legal Requirement that is or was applicable to Propulsys and WCDP or the conduct of their respective businesses. In fact, WCDP was in violation of the Social Insurance Law, the Labour Law, and the Annual Leave Regulations.

87.     On information and belief, Propulsys and Sellers knew at the time such representations were made and as of the Closing Date that these representations of present fact were false.

88.     Nonetheless, Propulsys made the representations intending for Danfoss to rely on them when purchasing Propulsys.

89.     Danfoss reasonably relied on Sellers' false representations in calculating the purchase price of Propulsys.

90.     As a result, Danfoss paid $7,712,127 more for Propulsys than it otherwise would have and suffered additional costs to bring WCDP's practices in line with governing law.

91.     Danfoss is entitled to money damages for Propulsys's fraud.

## PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Danfoss demands judgment as follows:

a)     compensatory damages in the amount proved at trial, plus interest, attorneys' fees, and costs of suit;

b)     punitive damages;

c)     costs and fees;

d)     such other relief as this Court deems just and proper.


Dated: New York, New York
        July 10, 2018

                                WINSTON & STRAWN LLP

                                By: s/ Seth E. Spitzer
                                    Seth E. Spitzer
                                    Andrew T. Foglia
                                    200 Park Avenue
                                    New York, NY  10166
                                    Tel.: (212) 294-6700
                                    Fax: (212) 294-4700
                                    sspitzer@winston.com

afoglia@winston.com

*Attorneys for Danfoss Power Solutions (US)*
*Company*